IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 15, 2019

## STATE OF TENNESSEE v. WILBERT LAMARI LOTTIE, III

**Appeal from the Circuit Court for Bedford County**
**No. 18546     Forest A. Durard, Jr., Judge**

_____

### No. M2018-01700-CCA-R3-CD

_____

Wilbert Lamari Lottie, III, ("Defendant") pled guilty, as a Range I standard offender, to one count each of possession of 0.5 grams or more of cocaine with intent to sell and possession of 0.5 grams or more of cocaine with intent to deliver and received a ten-year community corrections sentence. Six months into his sentence, the trial court issued a violation of community corrections warrant, which alleged that Defendant had tested positive for cocaine. Following a hearing, the trial court found that Defendant had violated the terms of his community corrections sentence. The trial court revoked Defendant's community corrections sentence and resentenced Defendant to twelve years to serve in the Tennessee Department of Correction. On appeal, Defendant argues that his sentence is excessive and that the trial court "did not follow the established sentencing guidelines." Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Thomas E. Parkerson, Murfreesboro, Tennessee, for the appellant, Wilbert Lamari Lottie, III.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Mike Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

On April 17, 2017, the Bedford County Grand Jury indicted Defendant for possession of 0.5 grams or more of cocaine with intent to sell and possession of 0.5 grams or more of cocaine with intent to deliver, Class B felonies. On July 24, 2017, Defendant entered an open guilty plea to the indictment. At a sentencing hearing conducted November 20, 2017, the trial court merged his convictions and sentenced Defendant, as a Range I standard offender, to ten years to serve on community corrections. In its sentencing order, the trial court provided the following summary of relevant facts:

> On January 14, 2014, [D]efendant was stopped by agents of the 17th Judicial District Drug Task Force. Various articles were found either on [D]efendant's person or in his vehicle. These included, among other items, laptops, a Kindle Fire, a pistol, cash and approximately [five] grams of cocaine. Once at the jail [D]efendant voluntarily produced slightly less than [two] grams of marijuana. Immediately before booking [D]efendant agreed to assist agents with further activities and investigations involving the drug trade.

In sentencing Defendant to community corrections, the trial court explained that it did so, in part, because it appeared that Defendant had "turned himself around" in the three years between his arrest and guilty plea. The trial court found that Defendant had "a terrible misdemeanor record back to about 1998[,]" as well as numerous prior probation violations. The trial court also noted that Defendant had "a long history of drug and alcohol abuse despite being in Cumberland Heights and successfully completing their course." The trial court considered, as enhancement factors, that Defendant had "a previous history of criminal convictions or behavior" and that he "failed to comply with conditions involving release into the community." As for mitigating factors, the trial court found that Defendant's conduct "neither caused nor threatened serious bodily injury" and that Defendant had arguably become a "productive citizen" and "assisted law enforcement with their investigations." The trial court said that it placed a "greater emphasis on what [D]efendant ha[d] accomplished during the interim between his arrest in January, 2014 and indictment in April, 2017" but noted that "[o]n paper and based on his prior history alone, [D]efendant is deserving of a 'to serve' maximum sentence."

On June 19, 2018, Defendant was arrested on a violation of community corrections warrant. At a subsequent hearing, Amanda Morrow testified that she was a community corrections case officer and that she supervised Defendant on community corrections. Ms. Morrow explained that, on May 7, 2018, Defendant tested positive for

cocaine use during a random drug screen. Ms. Morrow said that the test was sent to an outside lab for confirmation, and she provided a lab report and lab affidavit as an exhibit to her testimony. Ms. Morrow testified that Defendant had been placed on community corrections on November 20, 2017, and that he had reported twice weekly and passed fifteen prior drug screens. Ms. Morrow agreed that Defendant was working and paying child support. Ms. Morrow explained that, while on community corrections, Defendant completed a drug and alcohol assessment. Ms. Morrow said that the assessment recommended treatment, which was discussed with Defendant, but that Defendant declined treatment. Ms. Morrow testified that, in her experience, when an offender with a history of drug abuse refused drug treatment, he was "unlikely to be rehabilitated." Ms. Morrow agreed that Defendant had spinal surgery "several months back."

Defendant testified that he was thirty-eight years old, had four children, and that he had worked as a maintenance supervisor while on community corrections. Defendant stated that he was current on paying his child support. Defendant explained that, after being placed on community corrections, he had cervical spine surgery and was prescribed various pain medications. Defendant testified that he had stopped abusing drugs for "quite a few years" before his surgery. However, he relapsed and began using cocaine after he ran out of his prescription medication following his surgery. Defendant testified that he used cocaine the night before his drug screen with Ms. Morrow. He agreed, however, that he told the trial court at a bond hearing on the violation warrant that he failed the drug screen because he picked up some cocaine that a friend left on his table and then licked his fingers. Defendant agreed that he had violated his community corrections sentence by testing positive for cocaine. He stated that he needed drug rehabilitation to deal with his long-term drug abuse.

The trial court found that Defendant violated the terms of his community corrections. The trial court explained that it had reviewed the presentence report, the testimony from the prior sentencing hearing, and the court's previous sentencing order. During the parties' arguments regarding resentencing, the prosecutor commented:

> And I think it is incredibly significant also that this defendant lied to this Court. . . . [Defendant] had a bond hearing and he volunteered this story that a friend left cocaine on a table and he got the cocaine in his system by licking his fingers -- touching the bag[.]
>
> . . . .
>
> [A]nd I certainly don't recall him saying yeah, later on that night I used some cocaine.

- 3 -

The trial court responded, "General, your recollection is accurate. I remembered that and thinking that is the biggest bunch of bull I ever heard in my life."

The trial court then ruled:

> In th[is] type of case the Court has to make sentencing findings just as we did originally.
>
> Of course he is a Range One offender. All of the previous enhancement factors that applied still apply, which were 1 and 8 and 13. And there [are] really not any mitigating factors. I understand of course there is some case law that says drugs, depending on what the drug is, that mitigating factor [1] could be applied.
>
> And I will tell you particularly in the cases of cocaine I have never applied that or if I applied it I would not give it much if any weight. I have been very consistent on that because of the dangerous nature of that drug.
>
> So in looking at particularly at enhancement factor 1, there are [eleven] prior A misdemeanors. Three for failure to appear, a couple of simple possessions. I believe there was a revoked license. It was a[n] A misdemeanor, an evading, an assault, aggravated trespass, reckless endangerment.
>
> B misdemeanors, three revoked on driving on revoked, a couple of criminal impersonations, reckless driving.
>
> C misdemeanors were leaving the scene, an open container, a speeding, and I don't put a whole lot of -- unless they are a chronic speeder, I don't put a lot emphasis on that. Everybody in this room has gotten a speeding ticket at some point in time. A seatbelt, I don't put a lot of emphasis on that unless it involves children or you are a chronic – you have a chronic problem with that and willfully failed to comply with the law in regard to wearing your seatbelt.
>
> It is kind of interesting to note on the open container he wound up getting his probation revoked on that which has kind of mystified me a little bit because I thought that was fine only. That was back in 2002. The General made mention of some violations of probation and I don't know if they are spelled out in here or not, but you have to dig a little bit and you start looking into like for instance beginning on page 8 and working our

way backwards there was an offense date of October 3, 2005, casual exchange. He got 11 months and 29 day sentence on that. It coincided with the evading arrest and legend drug convictions found on the bottom of 7. Those conviction dates are February 8, 2006; okay. This is February 8, 2006, could not stay out of trouble for a month before he got a failure to appear with an offense date of March 7, 2006 and that had [to] do also with the driving on cancelled, suspended or revoked on top of that. And on top of that he gets a six months sentence on the revoked driver's license.

And then if you look at the top of the page, while still being on probation he gets a criminal trespass or aggravated criminal conviction. So he should have been revoked several times and does not necessarily indicate, or the report does that he got revoked but there should have been some type of revocation on that.

Then he has problems in 2010 and it jumps to 2014 after that. But he has like [twenty-one] misdemeanors. I noted in my order dated sometime in November of last year that he was really on paper deserving of a to-serve sentence. I will tell both sides why I did what I did so everybody knows. There was about a [three]-year gap between the event in this particular situation and the time of indictment. [Defendant] had made, and I don't know why he was out for three years and doing whatever, he may have been helping these guys, I don't know exactly what the circumstances were surrounding that, but during that interim, it did appear as though very well at his sentencing hearing and I took the carrot and stick approach with the whole thing and went out on a limb, . . . but at some point everybody reaches accountability. And I have noticed up here in the five years when I took this job, I knew drugs were a problem, they are not a problem, they are an epidemic. They are awful. They are getting worse, not better. But I thought perhaps during those three years that [Defendant] had perhaps turned himself around. There are some cases that gave some inference to perhaps in a peculiar situation like these [cases], he has been out for three years, what purpose is it going to serve when he has taken advantage of those three years, gotten a job, supporting his family, been testing clean, there was just anything to be gained by incarcerating him at that time, although on paper he was fully deserving of being incarcerated. But I also told him, don't come back here . . . and I meant it.

So in this particular case the sentence is going to be increased to [twelve] years. One of the things that really troubles me is this half[-]truth, and that is characterizing that in its best light. I remember specifically his

testimony a couple of months ago that it struck me as so odd, and I was thinking, just own it, that would be a lot more [palatable] to me than somebody telling me some bull story like I heard. At the bond hearing he told me that somebody came over with some cocaine and laid it on the table and first thing that pops in my mind, why are you letting people in the house with cocaine to begin with. Then he says he picks it up and thereafter wipes his mouth or something, and that is how he tested positive. And I am like, come on, can't you do better than that. And now today we learn that not only did that perhaps occur, but he actually used it. The first story may have been complete bull and the second story is probably more truthful, it is evident by the report that was generated by the lab indicating he tested positive for cocaine.

So it is going to be increased to [twelve] years. As I understand it [twelve] years still does not preclude him from further [c]ommunity [c]orrections, however, and I'm going to go through these, I have taken into consideration his presentence report, not a whole lot of testimony on his physical and mental condition other than his addiction.

The circumstances surrounding the totality of everything that has happened from the original charge to the violation.

His prior criminal history I already mentioned.

Whether or not he might . . . reasonably be expected to be rehabilitated or his potential or lack of potential for rehabilitation during the term. And he has already demonstrated that he can't, it is not working. [Defendant] denied . . . the services that were offered to him for rehabilitation, and that is very concerning.

Whether or not it appears the defendant would abide by the terms of probation. Apparently not, it is even in the presentence report. Whether or not the interest[s] of society are being protected from future criminal conduct are great. He did well for a while, during the three years, and then he didn't last a year on this thing.

Whether or not measures less restrictive than confinement have been frequently or recently applied. They have been. And whether or not a sentence of full probation would unduly depreciate the seriousness of the sentence. He basically got a full probated sentence already, although it was on [c]ommunity [c]orrections the last time.

And whether or not confinement is an effective deterrent to others. Of course using that as a sole basis, there has to be some special need or consideration in the jurisdiction.

We have a B felony conviction. We have [twenty-one] misdemeanors that probation has been revoked or should have been revoked in. We have this half[-]truth that he told me which I think weighs heavy on the lack of potential of being rehabilitated. I told [Defendant] not to come back here. I caught a lot of fire about doing what I did, but I did what I thought was right and he did wrong by me so he can go serve his [twelve] years.

Following the hearing, the trial court entered a written order revoking Defendant's community corrections sentence and resentencing Defendant to twelve years to serve in the Tennessee Department of Correction. This timely appeal follows.

## Analysis

### *Revocation of Community Corrections*

Under the provisions of the Community Corrections Act, the trial court possesses the power to revoke a sentence imposed "at any time due to the conduct of the defendant[,]" and the court may resentence the defendant to "any appropriate sentencing alternative, including incarceration, for any period of time up to the maximum sentence provided for the offense committed, less any time actually served in any community-based alternative to incarceration." Tenn. Code Ann. § 40-36-106(e)(4) (2018). The trial court's revocation of a community corrections sentence will be upheld absent an abuse of discretion. *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001). To establish an abuse of discretion, a defendant must show that there is "no substantial evidence" in the record to support the trial court's decision. *Id.* (citing *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991)).

Here, the record clearly supports the trial court's revocation of Defendant's sentence based on Defendant's use of cocaine while on community corrections. In fact, Defendant does not contest the trial court's finding that he violated the terms of his community corrections sentence. Rather, Defendant contends that the maximum sentence he received "is excessive in all regards because sentencing factors were not properly documented and mitigating factors and alternative sentencing [was] not considered." He argues that untruthfulness is not an enhancement factor and, to the extent his untruthfulness to the trial court was used against him to increase his sentence, the sentence is not incompliance with Tennessee Code Annotated section 40-35-114.

Defendant further argues that, while on community corrections, he maintained employment, had regular contact with his probation officer, paid his child support, and had no new convictions and that it was the exposure to pain medication after his back surgery that caused his relapse. Defendant contends that he is a non-violent offender who seeks to rehabilitate himself and that the trial court should have sentenced him as such. The State responds that the trial court properly exercised its discretion by imposing the maximum sentence of incarceration. We agree with the State.

*Resentencing*

If the trial court chooses to "resentence a defendant to a sentence more severe than the original, the trial court must conduct a sentencing hearing pursuant to the principles of the Sentencing Reform Act." *State v. Crook*, 2 S.W.3d 238, 240 (Tenn. Crim. App. 1998) (citations omitted). The trial court's sentencing decision is reviewed under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

The record reflects that the trial court conducted a thorough resentencing hearing and considered all of the statutory purposes and principles of sentencing. *See* Tenn. Code Ann. §§ 40-35-102; -103; -210 (2018). The trial court considered several enhancement factors and found that no mitigating factors applied. The court found that Defendant had twenty-one prior misdemeanor convictions and several prior probation revocations. *See* Tenn. Code Ann. § 40-35-114(1), (8) (2018). The twelve-year sentence imposed by the trial court is within the appropriate range for the Class B felony of possessing more than 0.5 grams of cocaine with the intent to sell. *See* Tenn. Code Ann. §§ 39-17-417(c)(1); 40-35-112(a)(2) (2018). Thus, the trial court's sentencing decision is granted a presumption of reasonableness.

In sentencing Defendant, the trial court was particularly troubled by Defendant's "half[-]truth" at his bond hearing about why he tested positive for cocaine on the drug screen. Defendant contests the trial court's reliance on this factor in resentencing him; however, a defendant's truthfulness can be considered probative on the issue of the defendant's potential for rehabilitation. *See State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994); *State v. Justin Daniel Adams*, No. M2016-00835-CCA-R3-CD, 2017 WL 929414, at *6 (Tenn. Crim. App. Mar. 8, 2017), *no perm. app. filed*. Moreover, a defendant's lack of candor militates against the grant of an alternative sentence. *See, e.g., State v. Kendrick*, 10 S.W.3d 650, 656 (Tenn. Crim. App. 2001). Defendant contends that the trial court should have returned him to community corrections and given him the opportunity to complete drug rehabilitation. However, the trial court found that

Defendant had previously completed a drug rehabilitation program but that he did not stop using cocaine at that time.  Moreover, Defendant declined treatment after it was recommended on a drug and alcohol assessment which he completed while on community corrections.  Under these circumstances, the trial court did not abuse its discretion in resentencing Defendant to twelve years and ordering Defendant to serve his sentence in confinement.

## **Conclusion**

For the aforementioned reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE